## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |
|---|---|
| 303030 TRADING LLC, <br><br> Plaintiff, <br><br> -against- <br><br> BANK OF AMERICA CORPORATION; CREDIT SUISSE GROUP AG; J.P.MORGAN CHASE & CO.; HSBC HOLDINGS PLC; BARCLAYS BANK PLC; LLOYDS BANKING GROUP PLC; WESTLB AG; UBS AG; ROYAL BANK OF SCOTLAND GROUP PLC; DEUTSCHE BANK AG; and CITIBANK NA, <br><br> Defendants. | <br><br><br><br> **CLASS ACTION COMPLAINT** <br><br><br><br> **JURY TRIAL DEMANDED** |

Plaintiff 303030 Trading LLC ("Plaintiff"), by its counsel, brings this action against Defendants, for violations of the Sherman Act of 1890, codified as amended at 15 U.S.C. § 1, *et seq.*, and the Commodity Exchange Act of 1936, codified as amended at 7 U.S.C. §§ 1, *et seq.* (the "Commodities Act"), on behalf of himself and all others who, between 2007 and 2009, and perhaps later (the "Class Period"), transacted Libor-based contracts or financial instruments whose value declines as Libor declines.   Plaintiff's allegations are based upon personal knowledge with respect to its conduct and upon information and belief as to other allegations based on facts obtained during the course of its attorneys' investigation.

### SUMMARY OF ALLEGATIONS

1.      This case concerns Defendants' manipulation and suppression of the London InterBank Offered Rate ("Libor").  Defendants, among others, self-report the interest rates used to calculate Libor.

2.     Defendants are major banks that undertake economic risk based on the interest rates at which they borrow and lend money and engage in other transactions.  Defendants both provide the reports that form the basis for Libor and engage in transactions whose success or failure (from the Defendant banks' perspective) is determined by Libor and its fluctuations.  The Libor-reporting Defendant banks thus face incentives to manipulate Libor to their advantage.  While the mechanisms for calculating Libor attempt to insulate Libor from individual bank's efforts to manipulate it, Libor is nonetheless sensitive to collective or coordinated manipulation.  Defendants' manipulation of Libor is revealed through the collapse of long-standing relationships between Libor rates and prevailing interest rates based on actual market transactions.

3.     Libor is determined on a daily basis based on the rate at which Defendants (and several other major banks) can purportedly borrow funds from other banks, as reported to the British Bankers' Association ("BBA").  The BBA's formula excludes the top and bottom four reported rates and then averages the rest of the self-reported rates to calculate the daily Libor.  Libor is used to price numerous fixed income products including: interest rate swaps, futures, options, and other derivative products.  As such, Libor is one of the fundamental benchmarks for global financial markets.

4.     Actual trading activity assures the economic reality of market-priced instruments.  Self-reported Libor figures are not verified by actual trading and thus are susceptible to manipulation.

5.     During the Class Period, Libor departed from long-standing economic relationships to market-priced financial instruments.  Market-priced financial instruments – including, the bid rate for Eurodollar deposits ("Eurodollar Bid Rate") and credit default swaps

("CDS") – contradict the suggestion that Libor was not manipulated.  These market-priced instruments indicate that self-reported Libor rates did not reflect economic reality.  As described below, the estrangement of market-priced financial instruments from self-reported Libor shows that the Defendants were either manipulating Libor or failing to avail themselves of multi-billion dollar arbitrage opportunities.  Defendants – all immense and sophisticated financial entities – were not leaving enormous arbitrage opportunities on the table.

6.      Defendants' manipulation of Libor is reflected in Defendants' anomalous Libor reporting during the Class Period.  Because the BBA excludes the top and bottom four reported rates, if the reporting banks collude and know what the other banks will be reporting, they can most effectively manipulate Libor by bunching their reported rates around the fourth lowest rate (if they want to suppress Libor) or the fourth highest rate (if they want to inflate Libor).  As a matter of fact, during the Class Period, there was substantial bunching of reported rates near the fourth lowest rate.  An academic study of Libor found "pronounced bunching" of self-reported rates in the first six months of 2009.  Absent collusion and manipulation, one would not expect Defendants' self-reported rates to clump together at the lower bound.

7.      Defendants' self-reported rates showed other anomalies that are unlikely in the absence of manipulation.  Some Defendants' reported rates to the BBA were *lower* than those of competitor banks' for dollar-based Libor but were *higher* (when compared to the same competitor) for Yen-based Libor.  While interest rates may differ between currencies, the rates banks pay should be parallel across currencies– *i.e.*, if Bank A reports a *higher* Yen-based Libor than Bank B, Bank A should also have a *higher* dollar-based Libor than Bank B, yet this is the opposite of what happened.  Empirical research provides numerous instances of such discontinuities, which provide further evidence of manipulation.

8.     Defendants manipulated Libor to enrich themselves and staunch losses during the credit crisis.  Defendants are principals to, or traders in, enormous amounts of swaps, loans, Eurodollars, and other financial instruments whose value is directly tied to Libor.  Artificially lowered Libor rates allowed Defendants to earn or retain billions of dollars that they would not otherwise have earned had Libor not been suppressed.  Defendants attached Libor floors to many loans so that Defendants would continue to be paid a substantial interest rate on those loans even if Libor rates were exceedingly low.

9.     Plaintiff alleges that Defendants' unlawful and intentional misreporting, suppression and manipulation of Libor rates, as well as their efforts to restrain trade in the market for Libor-based derivatives during the Class Period, violated Sections 4s(h), 9(a)(2) and 22(a) of the Commodities Act and the Sherman Act, 15 U.S.C. § 1.  Defendants' suppression of Libor caused Plaintiff and other members of the proposed Class to pay more and/or receive less from Libor-based financial instruments and Plaintiff and the Class were injured by this misconduct.

## JURISDICTION AND VENUE

10.     This action arises under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and Section 22 of the Commodities Act, 7 U.S.C. § 25.

11.     This Court has jurisdiction over this action pursuant to Section 22 of the Commodities Act, 7 U.S.C. § 25, Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26(a), and 28 U.S.C. §§ 1331 and 1337.

12.     Venue is proper in the Northern District of Illinois, pursuant to Section 22 of the Commodities Act, 7 U.S.C. § 25(c), and 28 U.S.C. § 1391(b), (c) and (d).  Each of the Defendants transacted business in the this District and a substantial part of the events or

omissions giving rise to the claims here occurred in this District.  Defendants' unlawful conduct manipulated the prices of Libor-based derivative products traded in this District.

## PARTIES

13.     Plaintiff 303030 Trading LLC ("303030" or "Plaintiff") is an Illinois limited liability corporation with its principal place of business in Lake County, Illinois.  303030 traded in Eurodollar futures on an exchange and received less, or paid more, because the Libor rate was less than what it would have been in the absence of Defendants' unlawful conduct.

14.     Defendant Bank of America Corporation ("Bank of America") is a Delaware corporation headquartered in Charlotte, North Carolina.  During the Class Period, Bank of America was a member of the BBA's U.S. dollar Libor panel.

15.     Defendant Credit Suisse Group AG ("Credit Suisse") is a Swiss company headquartered in offices in Zurich, Switzerland.  During the Class Period, Credit Suisse was a member of the BBA's U.S. dollar Libor panel.

16.     Defendant J.P. Morgan Chase & Co. ("JP Morgan") is a Delaware financial holding company headquartered in New York, New York.  During the Class Period, JP Morgan was a member of the BBA's U.S. dollar Libor panel.

17.     Defendant HSBC Holdings plc ("HSBC") is a British public limited company headquartered in London, England.  During the Class Period, HSBC was a member of the BBA's U.S. dollar Libor panel.

18.     Defendant Barclays Bank plc ("Barclays") is a British public limited company headquartered in London, England.  During the Class Period, Barclays was a member of the BBA's U.S. dollar Libor panel.

19.     Defendant Lloyds Banking Group plc ("Lloyds") is a British public limited company headquartered in London, England.   Lloyds was formed in 2009 through the acquisition of HBOS plc ("HBOS") by Lloyds TSB Bank plc ("Lloyds TSB").   During the Class Period, both HBOS and Lloyds TSB were members of the BBA's U.S. dollar Libor panel.

20.     Defendant West LB AG ("West LB") is a German joint stock company headquartered in Dusseldorf, Germany.   During the Class Period, West LB was a member of the BBA's U.S. dollar Libor panel.

21.     Defendant UBS AG ("UBS") is a Swiss company based in Basel and Zurich, Switzerland.   During the Class Period, UBS was a member of the BBA's U.S. dollar Libor panel.

22.     Defendant Royal Bank of Scotland Group plc ("Royal Bank of Scotland") is a British public limited company headquartered in Edinburgh, Scotland.   During the Class Period, Royal Bank of Scotland was a member of the BBA's U.S. dollar Libor panel.

23.     Defendant Deutsche Bank AG ("Deutsche Bank") is a German financial services company headquartered in Frankfurt, Germany.   During the Class Period, Deutsche Bank was a member of the BBA's U.S. dollar Libor panel.

24.     Defendant Citibank NA ("Citibank") is a wholly owned subsidiary of the United States financial services corporation Citigroup, Inc., which is headquartered in New York, New York.   During the Class Period, Citibank was a member of the BBA's U.S. dollar Libor panel.

## FACTUAL ALLEGATIONS

### Libor and Its Significance

25.     Libor is an interest rate, determined on a daily basis and tied to the interest rates that banks pay to borrow unsecured funds from each other in London.   In short, Libor is the rate at which banks lend to banks.

6

26.     Despite the apparent simplicity of what Libor represents, Libor is profoundly important to the world economy because it is the benchmark used by banks, securities houses and investors to gauge the cost of unsecured borrowing in the money markets. As such, it is the primary benchmark for short term interest rates globally and is used as the basis for settlement of interest rate contracts on many of the world's major futures and options exchanges. Approximately $350 trillion of swaps and $10 trillion of loans are indexed to Libor. Libor is also the basis for settlement of interest rate contracts on many of the world's major futures and options exchanges. Libor's role as a key benchmark is so entrenched that changing to a less opaque market rate would be highly complex, difficult and controversial, if only because it would be treacherous to renegotiate countless legacy contracts on a new standard.

27.     Libor is as much a barometer as it is a benchmark. Libor is used as a barometer to measure strain in money markets, as a gauge of the market's expectation of future central bank interest rates, and, more recently, according to the BBA, by the media to measure the health of financial monetary markets.

28.     Thomson Reuters calculates and publishes Libor on behalf of the BBA. Publication is daily, during banking days, at mid-morning London time.  A panel of banks provide dollar-based Libor reporting.  The panel has at times had sixteen banks self-reporting banks providing information across the interest rate curve[1] at which they could borrow from other banks.  Thomson Reuters excludes the four lowest and the four highest self-reported rates and averages the middle rates for each duration.  The average is the Libor rate for the day for each duration.  Libor is calculated for ten currencies with 15 maturities quoted for each ranging

---

[1]   The interest rate curve plots interest rates on the vertical axis and loan duration on the horizontal abscissa, thus showing (for instance) the interest cost of borrowing for three months and the interest cost of borrowing for six months.

from overnight out to one year.  For dollar rates, the 3-month Libor is the most commonly used and important.

29.     The BBA defines Libor as "[t]he rate at which an individual Contributor Panel bank could borrow funds, were it to do so by asking for and then accepting inter-bank offers in reasonable market size, just prior to 11:00 London time."

30.     Libor rates are for unsecured loans between banks.

31.     Libor rates differ and would ordinarily be greater than the rates for secured loans, where the lender's outlay is protected with collateral.

32.     Libor is not an actively traded rate that one can see in the market, so the BBA relies on self-reporting banks to accurately disclose their borrowing costs.

33.     Libor is a benchmark for short-term interest rates.  Many derivative products are priced based on Libor.  The prices of these derivatives may be manipulated by manipulating Libor.

34.     Eurodollar contracts are one example of a financial product priced based on Libor rates.  Indeed, they are some of the most heavily traded interest rate products globally.  They are traded on electronic and physical exchanges like the Chicago Mercantile Exchange ("CME"). The final settlement price of a Eurodollar contract is 100 minus the Libor rate (*e.g.*, if the Libor rate on the relevant date is 3.00%, the value of that Eurodollar contract is 97; suppression of Libor causes higher prices for Eurodollar contracts).  This direct linear relation illustrates the interdependence between Libor and numerous derivative instruments based on Libor.

35.     Another financial instrument based on Libor is the interest rate swap ("swap").  In a swap, one party pays a fixed rate on a "notional" principal amount,[2] while the other party pays a floating rate, usually based on the 3-month Libor, on that same amount.  Swaps allow the parties to hedge interest rate risks to better match their asset-liability mix.  Swaps also allow the parties to make investments based on their estimates of future interest rates.

36.     Swaps are traded on electronic and physical exchanges like the CME.  Many swaps are based explicitly on Libor.

37.     Swap holders are impacted if Libor rates are manipulated.  When Libor rates are depressed, parties receiving payments that move in sync with Libor receive less than they otherwise would absent the manipulation of Libor.

38.     Defendants and other major banks have tremendous risk exposure to interest rates and concomitantly take enormous swaps positions.  By way of illustration, in the third quarter of 2007, Defendant JP Morgan alone had some $60 *trillion* in swaps.

39.     Defendants' motivation to manipulate Libor included increasing profits and reducing losses.

**Manipulation of Libor**

**Eurodollar Bid Rate versus Libor**

40.     Libor – since it purportedly reflects the reporting banks' cost of borrowing – should (if accurately reported) reflect the risks of lending to banks.  During the Class Period, longstanding relationships between the Defendant banks' self-reported Libor and market-based rates for lending to banks failed because Defendants suppressed Libor.

---

[2]  The principal amount is "notional" because the principal amount does not (usually) change hands between the parties.

41.     Starting in or around August 2007, during the financial crisis, Libor did not increase in comparable fashion to other interest rates.  Each Defendant's individual self-reported Libor number did not vary to account for their differing financial conditions and the different credit risks each Defendant reflected to its lenders.

42.     As a result of Defendants' manipulation of Libor, economic relationships between Libor and market-based interest rates – *i.e.*, rates based on observable financial transactions and not merely self-reported figures easily susceptible to manipulation – failed.

43.     Since Libor's 1984 inception, Libor has been some 6 to 12 basis points *higher* than the Eurodollar Bid Rate – a market rate that banks bid in the market for dollar deposits. Economic logic suggests that bid-offer spread between what banks are willing to pay to attract dollar deposits (*i.e.*, the Eurodollar Bid Rate) would be lower than the rate a bank would charge another bank to borrow those funds.  For example, if it costs banks to 2% to attract deposits (*i.e.*, the Eurodollar Bid Rate), economic logic and experience suggests that the rate at which banks would offer to loan that money to other banks (*i.e.*, Libor) would be 2.06% to 2.12%.

44.     By mid-2007, this longstanding relationship between the Eurodollar Bid Rate and Libor failed.  Indeed, it inverted as the Eurodollar Bid Rate increased far more than Libor. Without manipulation, it defies economic logic for the Eurodollar Bid Rate – what banks actually pay for deposits – to be *higher* than the Libor rate – what Defendants banks claim they charge each other to lend money.  In any well functioning market (which the pertinent markets are), when the bid price is above the offer price, arbitrage will drive bid prices down and/or offer prices up until there is a spread with the bid being below the offer.

45.     That has not been the case in the Eurodollar Bid Rate and Libor relationship since mid-2007.  The following chart graphs the difference between Libor and the Eurodollar Bid Rate

from 2006 through mid-2009. The chart shows that in August 2007 the long-standing relationship between Libor and the Eurodollar Bid Rate broke down and inverted such that the bid side (the Eurodollar Bid Rate) is higher than the offer rate (Libor), and so the difference between the offer and the bid was negative.



### Credit Default Swaps versus Libor

46.     The credit default swap ("CDS") market allows traders to purchase insurance and otherwise take positions on the financial health of various entities. By way of illustration, a purchaser of a CDS on a bundle from Citibank bonds would receive a payout if Citibank defaulted on those bonds. On the other side of the trade, a seller of a CDS on Citibank has similar exposure to Citibank as if the entity had purchased Citibank bonds or made a loan to Citibank. As a company's financial health actually or apparently deteriorates the cost of purchasing a CDS on that company's obligations rises.

47.     The price of a loan to a specific company should be the sum of the CDS spread (which accounts for the credit risk) and the underlying risk-free rate.  (Put differently, the CDS spread for a company should equal the difference between the rate on a loan to that company less the underlying risk-free interest rate).

48.     During the financial crisis many banks were perceived as likely unsound.  This caused CDS on those entities to rise substantially at the beginning of the Class Period.

49.     While CDSs insuring against default by the Defendants spiked during the Class Period, Defendants' self-reported Libor rate – the rate as which Defendants claimed they could borrow from other banks – did not increase to the same extent.

50.     The breakdown in the relationship between CDS and Libor is further evidence of Defendants' manipulation of Libor.  If an entity wanted to accept risk from a certain bank, it could loan money directly to that bank (in which cases the entity would receive interest from that bank and be exposed its credit risk) _or_ the entity could sell a CDS on Citibank (in which case the entity would receive the premium from the CDS and be exposed to Citibank's credit risk).

51.     During the Class Period certain Defendants were self-reporting Libor rates so that that a trader who made that loan and then purchased CDS protection against that bank would earn a negative return.  That is, the cost of insuring the loan to the bank was greater than the potential payout on the loan.  This makes no economic sense.

52.     During the Class Period, certain Defendants' self-reported Libor rates were substantially below the premium that investors would have earned had they sold CDS on Defendants.  For example, Defendant Citibank was self-reporting Libor rates below the market-rate of CDS on Citibank loans/bonds.  This makes no economic sense as the price of the loan should be the premium earned on CDS plus the risk-free rate.  The below chart shows: (1) that

Citibank and Bank of Tokyo both reported *nearly identical* Libor rates at the same time that the CDS market valued the riskiness of each bank rather differently, and (2) that the Citibank CDS spread was *greater* than Citibank's Libor quote, a nonsensical proposition.

**One Year LIBOR Quotes and CDS Spreads**



53.     An analysis by The Wall Street Journal found that Defendants' self-reported Libor rates did not correspond to Defendants' credit risk as measured in the CDS market.  That

analysis also found that Defendants with substantially different credit risks still reported identical Libor rates.

54.     Defendant Citibank's self-reported rates reflected the greatest difference from market-priced CDS.  Citibank's self-reported rates averaged approximately 87 bps *lower* than the rate calculated using CDS pricing.  Defendant West LB's self-reported rates were 70 bps lower, Defendant HBOS, 57 bps lower, Defendant JP Morgan, 43 bps lower, and so on.  In addition, as of March, 2008, Defendant West LB reported the *same* Libor rate as Defendant Credit Suisse even though West LB, in the CDS market, was seen as *twice* as likely to fail as was Credit Suisse.  None of these self-reported rates is economically coherent when compared to the actual market rates derived from CDS pricing.

### Other Instruments versus Libor

55.     Trading in loans auctioned by the Federal Reserve – which, unlike Libor, do require collateral – further demonstrates Defendants' manipulation of Libor.  At certain points during the Class Period, interest rates on collateralized loans from the Federal Reserve to banks were *higher* than the comparable self-reported Libor rate, which represents *un*collateralized loans between banks.

56.     Bids in the market for commercial paper, in which banks and companies issue short-term debt to investors to satisfy their temporary liquidity needs, showed the suppression of Libor.  For example, in April 2008, Defendant UBS was willing to pay 2.85% for money in the commercial paper market while at the same time reporting that it could borrow money from other banks at 2.73%.  Again, it makes no economic sense for UBS to bid 12 bps more than where money is offered – unless money is not really offered at that artificially low level.

**Anomalies in Defendants' Self-Reporting Of Libor Indicate Collusion and Manipulation**

57.     Defendants' actual reporting of their own borrowing costs to the BBA (i.e., the rates that feed into the Libor calculation) also supports Defendants' manipulation of Libor. Defendants' self-reported rates (a) were bunched near inflection points; (b) differed in ranking depending on the currency involved; and (c) lacked the differentiation between different Defendants that one would expect given differing credit risks among Defendants.

58.     Because the four lowest rates and the four highest rates submitted to the BBA are excluded from the calculation of Libor, an entity or group wishing to suppress Libor would attempt to coordinate as many bids as possible at or just above the fourth-highest Libor rate. Similarly, an entity or group wishing to inflate Libor would attempt to coordinate as many bids as possible at or just below the thirteenth-highest Libor rate.  Absent collusion, one would not expect to find the self-reported rates bunched at these points.

59.     During the Class Period, Defendants' self-reported rates clustered closely together, both in an absolute sense and relative to corresponding CDS pricing.

60.     Once the financial crisis began, both the absolute level and the variation of CDS quotes between or among different entities increased.  Concurrently, however, Libor reports did not increase as much as CDS quotes, tended to be bunched together more tightly, and bunched together around the fourth lowest Libor rate – precisely the kind of behavior that would most efficiently suppress the overall Libor rate.  Defendants' self-reported rates – both absolutely and the bunching of those rates – make no sense when view in light of market-based CDS rates.

61.     The figure below shows graphically the distribution of the market-priced CDS quotes and the self-reported Libor rates.  Though one would expect the distributions shown on each chart to be similar, in reality the Libor quotes demonstrate the bunching consistent with

Defendants' manipulation of Libor while the CDS quotes show a more normal distribution.  The chart also shows the bunching of quotes near the fourth-lowest quote.



62.     A May 29, 2008 article in The Wall Street Journal reported the results of its investigation into Libor rates.  The Journal's study – which was reviewed and found reliable by professors from Stanford University, Columbia University, and the London Business School – found that during the first four months of 2008 the 3-month Libor rates self-reported by Defendants remained on average within a tight 6 range bps despite Defendants' differing actual and perceived financial risks.  Stanford finance professor Darrell Duffie stated that Defendants' self-reported rates "are far too similar to be believed" and David Juran, a statistics professor at

Columbia, said that the Journal's analysis "very convincingly" shows that Defendants' self-reported rates are lower than what the market indicates.

63.     Defendants' self-reported Libor rates in different currencies provide further evidence of Defendants' manipulation of Libor.  During the Class Period it was common for banks to switch their ranking in Libor self-reporting when dealing in different currencies.  For example, Defendant Bank of America regularly quoted a *lower* dollar-based Libor than Bank of Tokyo-Mitsubishi while simultaneously quoting a *higher* Yen-based Libor than Bank of Tokyo-Mitsubishi.   Citibank, too, often self-reported rates at the top of the Yen-Libor scale while quoting rates at the bottom of the dollar-Libor scale.

64.     Because a given bank presents the identical credit risk regardless of the currency in which the risk is stated, there is no economic rationale for the banks to switch rankings depending on the reporting currency.  That is, if Bank A self-reports the lowest dollar-Libor, it should (assuming the same bucket of banks constitute each Libor panel) also report the lowest Yen-Libor rate.  This is not what happened.  Instead, Defendants' manipulation of dollar-Libor caused the cross-currency relationship to decouple.

**<u>Investigations of Libor Rate Setting</u>**

65.     Numerous regulators, professional organizations, analysts, and news agencies have investigated or are investigating Defendants' self-reported Libor rates.

66.     On March 15, 2011, Defendant UBS disclosed that it had received subpoenas from the United States Securities and Exchange Commission, the Commodity Futures Trading Commission and the Department of Justice, seeking information concerning "whether there were improper attempts by UBS, either acting on its own or together with others, to manipulate

LIBOR at certain times." UBS reported that the Japanese Financial Supervisory Agency also requested information relating to UBS's Libor self-reporting.

67.     On March 15, 2011, Financial Times reported that the United Kingdom's Financial Services Authority had requested similar information from UBS.

68.     On March 15, 2011, Financial Times also reported that Bank of America, Citibank and Barclays had received subpoenas and that "[a]ll the panel members are believed to have received at least an informal request for information[.]"

**Defendants' Financial Motivation to Manipulate or Suppress, and to Collude with respect to, Libor**

69.     During the Class Period, Defendants benefited from lower interest rates. They improved their position if interest rates, including Libor, were lower. In early 2009, Citi acknowledged that its net interest income would increase by approximately one billion dollars if interest rates fell by 1% over the course of a year. As alleged above, during this period Citigroup reported Libor rates near the bottom of the effective range, pushing the Libor rate lower than it otherwise would have been and enriching itself.

70.     Defendants are swap dealers or major participants in the swap market. Interest rate swaps are frequently tied directly to Libor. In 2009, Defendants Bank of America and JP Morgan Chase *each* had nearly $50 *trillion* (notional value) worth of interest rate swaps on their books, rendering the potential impact of rigged and manipulated Libor rates even greater for those Defendants.

71.     While Defendants lent money at Libor-based rates during the Class Period, they protected themselves from those artificially lowered Libor rates with "floor" rates on their loans such that the interest that Defendants would receive would be paid at the floor rate, which was higher than the actual, suppressed Libor rate.

72. Though Libor floors were rare at the beginning of the Class Period, they became more common over time.

73. Libor floors allowed Defendants to suppress Libor and earn huge profits on their swap and other derivative positions while not sacrificing much yield from their loan portfolios.

**Public Reporting Fostered Easy Monitoring of Libor Rate Quotes**

74. Libor rates were reported daily by each of the Defendants. These rates were also reported publicly so that Defendants could know where to bid the next day and would know if any of their co-conspirators had broken from their agreement to suppress the price of Libor.

75. Before the financial crisis began in mid-2007, the market-priced Eurodollar Bid Rate was a good indicator of the next day's Libor rate. Banks could take the Eurodollar Bid Rate from the prior day, add the 6-12 bps spread discussed above, and arrive at the proper Libor rate. When the relationship between the Eurodollar Bid Rate and Libor decoupled following Defendants' manipulation of Libor, the Eurodollar Bid Rate ceased to be a good indicator of the next day's Libor. Instead, during the Class Period, the lagging Libor rate (*i.e.*, the prior day's Libor) offered far more predictive power for subsequent Libor rates.

76. Because Libor rates are set and published each day, Defendants were able to coordinate their manipulation and suppression of Libor without constant communications between Defendants.

## CLASS ACTION ALLEGATIONS

77. Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23, on its own behalf and as representatives of the following class of persons and entities (the "Class"):

> All persons, corporations and other legal entities (other than Defendants, their employees, affiliates, parents, subsidiaries, and co-conspirators) that, during the

period from at least 2007 through 2009 (the "Class Period") (a) purchased directly from Defendants Libor-based financial instruments whose values increase as Libor decreases; (b) sold directly to Defendants Libor-based derivatives whose values decline as Libor decreases; (c) received payments directly from Defendants which decrease as Libor decreases and/or increase as Libor increases; or (d) purchased Libor-based derivatives whose values increase as Libor decreases, or sold Libor-based derivatives whose values decline as Libor decreases.

78.     The Class is individually so numerous that joinder of all members is impracticable.  While the exact number of members of the Class is unknown to Plaintiff at this time, based on the nature of the financial instruments involved, Plaintiff reasonably believes that there are at least thousands of members in the Class.  Class members are geographically dispersed throughout the United States.

79.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  These common questions of law and fact include, without limitation:

a.   Whether Defendants' conduct constituted a manipulative or unlawful act;

b.   Whether Defendants manipulated Libor-based derivatives;

c.   Whether Defendants conspired to manipulate Libor-based derivatives;

d.   Whether Defendants agreed or conspired to suppress, fix, or maintain Libor-based derivatives in violation of the antitrust laws;

e.   The geographic scope and duration of Defendants' manipulation of Libor-based derivatives;

f.   Whether Defendants' unlawful conduct caused injury to the business or property of the Plaintiff and the Class;

g.   The fact and amount of impact on Libor-based derivatives prices caused by Defendants' conduct; and

h.   The appropriate measure of damages.

80.    Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and the members of the Class have all sustained damage in that during the Class Period they transacted financial instruments tied to Libor, which was suppressed by Defendants. Defendants' conduct, the effects of such conduct, and the relief sought are all issues or questions that are common to Plaintiff and the other Class members.

81.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action antitrust and commodities litigation.  Plaintiff's interests are coincident with, and not antagonistic to, the interests of the other Class members.

82.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members of the Class is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class.  A class action would achieve substantial economies of time, effort and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness.  There will be no material difficulty in the management of this action as a class action on behalf of the Class.

**COUNT I**
**VIOLATION OF SHERMAN ACT SECTION 1**
(15 U.S.C. § 1)

83.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

84.     Defendants entered into and engaged in a conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Action and Section 4 of the Clayton Act.

85.     During the Class Period, Defendants controlled what Libor rate would be reported and therefore controlled prices in the market for Libor-based derivative contracts.

86.     The conspiracy consisted of a continuing agreement, understanding or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants fixed, maintained, and/or made artificial prices for Libor-based derivative contracts. Defendants' conspiracy is a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

87.     Defendants' conspiracy, and resulting impact on the market for Libor-based derivative contracts, occurred in an affected interstate and international commerce.

88.     As a proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have suffered injury to their business or property.

89.     Plaintiff and members of the Class are each entitled to treble damages for the violations of the Sherman Act alleged herein.

## COUNT II
## VIOLATION OF THE COMMODITY EXCHANGE ACT
(7 U.S.C. § 1, *et seq.*)

90.     Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

91.     The CME has been designated by the Commodity Futures Trading Commission ("CFTC") as a contract market pursuant to Section 5 of the Commodities Act, 7 U.S.C. § 7. CME submits to the CFTC various rules and regulations for approval through which CME designs, creates the terms of, and conducts trading in various Libor-based futures, options, swaps

and other derivative products.  CME is an organized, centralized market that provides a forum for trading Libor-based futures, options, swaps and other derivative products.

92.     As to the CME Libor-based derivatives, by their intentional misconduct, the Defendants each violated Section 9(a)(2) of the Commodities Act, 7 U.S.C. § 13(a)(2), and manipulated prices of Libor-based derivative contracts during the Class Period.

93.     Defendants' activities alleged herein constitute market power manipulation of the prices of CME Libor-based derivatives in violation of Sections 4s(h), 9(a) and 22(a) of the Commodities Act, 7 U.S.C. §§ 6s(h), 13(a) and 25(a).

94.     Defendants' extensive manipulative conduct deprived Plaintiff and other traders of a lawfully operating market during the Class Period.

95.     Plaintiff and others who transacted in CME Libor-based derivative contracts during the Class Period transacted at artificial and unlawful prices resulting from Defendants' manipulations in violation of the Commodity Exchange Act, 7 U.S.C. § 1, *et seq*., and as a direct result thereof were injured and suffered damages.

96.     Plaintiff and the Class are each entitled to damages for the violations of the Commodities Act alleged herein.

## COUNT III
## VICARIOUS LIABILITY UNDER THE COMMODITIES EXCHANGE ACT

97.     Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

98.     Each Defendant is liable under Section 2(a)(1) of the Commodities Act, 7 U.S.C. § 2(a)(1), for the manipulative acts of their agents, representatives, and/or other persons acting for them.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests for relief as follows:

(A)     For an order certifying this lawsuit as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, and designating Plaintiff as the Class representative, and its counsel as Class Counsel;

(B)     For a judgment awarding Plaintiff and the Class damages against Defendants for their violation of the federal antitrust laws, in an amount to be trebled in accordance with such laws;

(C)     For a judgment awarding Plaintiff and the Class damages against Defendants for their violations of the Commodities Act, together with prejudgment interest at the maximum rate allowable by law;

(D)     For an award to Plaintiff and the Class of their costs of suit, including reasonable attorneys' fee and expenses; and

(F)     For such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff respectfully demands a trial by jury on all issues triable to a jury.

Dated: Chicago, Illinois
          June 14, 2011

                                   Respectfully submitted,


                                   s/ Paul E. Slater_____
                                   Paul E. Slater
                                   SPERLING & SLATER
                                   55 West Monroe Street
                                   Suite 3200
                                   Chicago, Illinois 60603
                                   (312) 641-3200
                                   (312) 641-6492 (fax)
                                   pes@sperling-law.com

H. Laddie Montague, Jr.
Merrill G. Davidoff
Charles P. Goodwin
Michael C. Dell'Angelo
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, Pennsylvania 19103
(215) 875-3000
(215) 875-4604 (fax)
hlmontague@bm.net

*Of Counsel*

*Attorneys for Plaintiff and the Proposed Class*

**Notification of Affiliates – Disclosure Statement**

Pursuant to Local Rule 3.2 of the United States District Court for the Northern District of Illinois, 303030 Trading, LLC, by and through the undersigned counsel, states that it has no publicly held affiliates.

Respectfully submitted,

_s/ Paul E. Slater_____
Paul E. Slater
SPERLING & SLATER
55 West Monroe Street
Suite 3200
Chicago, Illinois 60603
(312) 641-3200
(312) 641-6492 (fax)
pes@sperling-law.com

H. Laddie Montague, Jr.
Merrill G. Davidoff
Charles P. Goodwin
Michael C. Dell'Angelo
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, Pennsylvania 19103
(215) 875-3000
(215) 875-4604 (fax)
hlmontague@bm.net

*Of Counsel*

*Attorneys for Plaintiff and the Proposed Class*